**UNITED STATES DISTRICT COURT**
<u>**SOUTHERN DISTRICT OF NEW YORK**</u>

|                                     |   |                         |
|-------------------------------------|---|-------------------------|
| **PAULETTE GANGEMI,**               | : |                         |
|                                     | : |                         |
| **Plaintiff,**                      | : | Case No. _____  |
|                                     | : |                         |
| v.                                  | : | <u>**COMPLAINT**</u>    |
|                                     | : |                         |
| **ARCH ONCOLOGY, Inc., THE BOARD**  | : |                         |
| **of DIRECTORS of ARCH, and**       | : |                         |
| **LAURENCE BLUMBERG,**              | : | **JURY TRIAL DEMANDED** |
|                                     | : |                         |
| **Defendants**.                     | : |                         |

<u>**PRELIMINARY STATEMENT AND INTRODUCTION**</u>

1.      This is a civil action for monetary relief for damages incurred by Plaintiff, Paulette Gangemi ("Plaintiff" or "Gangemi"), as a result of the tortious actions of defendant, Laurence Blumberg ("Blumberg" of Defendant) in fraudulently inducing Gangemi into accepting employment with defendant Arch Oncology, Inc. ("Arch," the "Company" or "Defendant"), whose actions were approved and ratified by the Arch Board of Directors ("Directors" or "Defendant Board").

2.      As more fully detailed below, Gangemi, based on misrepresentations and promises made by Blumberg, and ratified by the Board, as well as misrepresentations made directly by various members of the Board, joined Arch on July 25, 2022 as its Human Resources Vice President, pursuant to a certain Offer Letter ("Offer") which, among other things, guaranteed Gangemi a severance of six months' salary should she be terminated without cause,

only to discover that Arch essentially was close to out of business when she interviewed Arch, and had been in dire financial straits well before Gangemi was hired.

3.      In fact, no sooner had Gangemi become an employee of Arch that, incredibly, she was directed by Defendant Blumberg to formulate a "Severance Plan" as Arch was beginning to lay off most of its employees.

4.      Based on the misrepresentations made by Blumberg and the Board, Gangemi left the employ of her former employer where she had been earning approximately, Three Hundred, Thirty-Five Thousand ($335,000.00) Dollars, per annum.

5.      In addition to the $335,000.00 which Gangemi lost as a result of leaving her former employer based on the misrepresentations of Blumberg and members of the Board, Arch has failed to pay Gangemi her Severance of One Hundred, Thirty-Seven, Five Hundred ($137,500.00) Dollars.

6.      As a result of the foregoing, Ms. Gangemi has been damaged in at least the amount of Four Hundred Seventy-Two Thousand ($472,000.00) Dollars.

## **JURISDICTION**

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 as the Plaintiff is a resident of the State of New Jersey and all Defendants are residents of States other than New Jersey, with the amount in controversy being in excess of Seventy Five Thousand ($75,000.00) Dollars, as well as a violation of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"); upon information and belief, Arch is a Delaware corporation with headquarters in Brisbane, California, and an office in New York City,

while Defendant Blumberg is a New York resident, and, upon information and belief, none of the members of the Defendant Board are residents of New Jersey.

8.       Venue properly lies in the Southern District of New York as essentially all acts complained of herein arose therein.

## THE PARTIES

9.       Gangemi is a resident of Lambertville, New Jersey and an experienced Human Resources executive with more than 20 years of experience; she holds a Master's Degree in Labor and Employment Relations from Rutgers University.

10.      Defendant Arch is a privately-held, clinical-stage immuno-oncology company that aims to discover and develop potential best-in-class antibody therapies for the treatment of patients with cancer.

11.      Arch's lead therapy is AO-176, an anti-CD47 antibody which is optimized for anti-cancer activity. At all relevant times herein, Arch was advancing AO-176 in Phase 1/2 clinical trials for the treatment of patients with select solid tumors and with hematologic malignancies, both as monotherapy and in combination with standard therapies.

12.      The Board of Arch, upon information and belief, consists of 6 individuals none of whom are residents of the State of New Jersey. Upon information and belief, collectively, the Board was elected by the shareholders of Arch and for purposes of jurisdiction would be considered a resident of the state of Delaware.

## THE BACKGROUND FACTS

13.      Sometime in April 2022 Gangemi accepted an interview with Abby Kohut, owner of Staffing Symphony LLC, a third-party employment recruiter, on behalf of Arch.

At the time, Gangemi was an employee of Daiichi Sankyo, Inc. ("Daiichi"), a Japanese company.

14.     On or about May 5, 2022, Gangemi had a second interview with one, Julie Schroeder ("Schroeder"), a contract HR person hired by Arch, upon information and belief, through Danforth Advisors, a company retained by Blumberg on behalf of Arch. The position advertised provided for a salary of $275,000 per annum, plus stock options.

15.     Prior to the interview, Schroeder called Gangemi several times to set up interviews with the Company extolling both Defendant Blumberg and Arch, indicating among other things that Arch was a solid company with a rosy future.

**INTERVIEWS WITH BLUMBERG**

16.     On May 5th Gangemi interviewed with Michie Nakano, Director of Operations ("Nakano"), Blumberg's personal assistant.

17.     On May 13, 2022, Gangemi interviewed directly with Blumberg.

18.     During this interview, and in another "Teams" video call, Gangemi inquired about the details concerning the value of the stock Arch would be granting her if hired, i.e., its valuation, as well as the Company's "burn rate" and its prospects, aware that Arch was a young company in the biotech industry.

19.     During the interview Blumberg told Gangemi that Arch had "an elite group of investors who are 100% behind me, the team and the company" He further opined that the stock, *at present value as he stated*, was worth more than Gangemi's $240,000 of Restricted Stock Units ("RSU's) Gangemi had with her current employer at the time, Daiichi. Blumberg

continued that the options were worth a little more than that, and said that "walking in the door, you're already ahead." *(All emphasis provided)*

20.     The stock options were of utmost importance to Gangemi since, as a two-time employee of Daiichi, she always had been awarded RSU's as part of her compensation. She would not entertain a new employment possibility without a commensurate remuneration package to that of Daiichi.

21.     However, Gangemi would later come to learn that the stock options which Blumberg represented at length were so valuable, were not worth anything at the time Blumberg made these statements because Blumberg had never ordered the valuation of the Company as he had been directed, and that any equity granted in April of 2022 had neither been valued nor approved.

22.     The 409A Valuation, and Board approval of the equity plan, both had lapsed in April 2022; any equity granted after that date essentially had no value.  Not only did Blumberg not disclose this during the interview, even though Gangemi repeatedly asked questions regarding cash on hand, the Company burn rate, and the equity value, but he withheld information upon which he knew, or should have known from the interview, was of utmost importance to Gangemi in reaching a decision to accept an engagement with Arch.

23.     Blumberg further said that "Cash is not an issue with this company, we have plenty of cash," adding a number of times that the Company "had an elite group of investors that were 100% behind the company and the leadership team." "Money is no object," said Blumberg.

24.     Blumberg also told Gangemi that the Company's molecules, G2 and G4 ("G2" "G4"), the former of which Arch was planning as a sub cutaneous delivery to pre-dosing patients with Eliquis, an anticoagulant.

25.     He also said that G4 was the "next generation of G2, had a better safety profile and better efficacy." He also represented that while there were risks in any biotech and drug discovery, Arch, based on its impeccable record, had a "bright future" and the team of leaders and scientists were excellent.

26.     On May 24th Gangemi interviewed with Garen Bohlin ("Bohlin"), an "advisor" to both Arch and Blumberg, although Gangemi never quite figured out on what level, as Bohlin was not an employee of the Company.  Gangemi later learned that, in January, 2022, Bohlin had introduced Blumberg to Kallendar and Associates, a "wind down firm."

27.     On May 24, 2022, Gangemi also interviewed with Kirsten Anderson, Arch's CFO ("Anderson"), and with Steve De Mattos, SVP of Clinical Operations ("DeMattos"), during which she was informed of the Company's bright future growth, details about their organizations, the Veeva system that was being implemented, and, at least according to De Mattos, Blumberg's leadership.

28.     During the interview, Gangemi asked Anderson about the Company's "burn rate" which Anderson said she believed at the time was approximately $3 million a month.

29.     On June 8, 2022, Gangemi interviewed with Carol Nuechterlein, J.D., a Board member located in Basel Switzerland ("Carol N." or "Nuechterlein").

30.     During that interview, Nuechterlein said that this was Blumberg's first CEO role and, that among other things, he needed professional assistance with interfacing with the Board of Directors especially as it came to personnel.  Nuechterlein added that the Chairman,

John McKearn ("McKearn"), had chosen Blumberg for the CEO role because he was an M.D., and had formerly owned his own investment fund, Blumberg Capital Management.

31.     Nuechterlein's interview with Gangemi led Gangemi to believe that the Company and the team was over-performing and further evidence that the Company enjoyed a solid financial position and was well capitalized.

32.     On June 14, 2022, Gangemi again interviewed in New York with Blumberg, the entire executive team, the leadership team of the Board, Julie Schroeder, and Board Member Eric Pham ("Pham") at the Arch Offices at 257 Park Ave. N.Y. N.Y.

33.     During the one-on-one interview between Blumberg and Gangemi, in response to Gangemi's inquiries, Blumberg reiterated most, if not all, of the statements he had made in the first interview and went on to describe how well the Board meeting had gone that day and the day before.

34.     Blumberg reiterated, almost verbatim, what he said in prior interviews about the Company's present financial situation; that "cash is not an issue, our issue is execution and supporting the team so they can conduct the studies."  "We have an elite group of investors that are 100% behind the team and the Company."  Blumberg further sold the equity position in the Company (i.e., stock options), as significant and worth more than Gangemi was "…leaving on the table…" at Daiichi.

35.     On June 22, 2022, by Zoom, Gangemi interviewed with John McKearn, Chairman of the Board, and separately with Carrie Brachmann, VP of Translational Science, via Zoom, during which both indicated the Company to be in good financial condition.

**The Offer**

36.     On or about June 27th Blumberg called Gangemi from his office in New York and offered her the position of VP of Human Resources ("HR"). During that telephone call Blumberg again raised the issue of Gangemi's soon-to-be equity stake in Arch, and how valuable that would be as he extolled the future growth of the Company. He mentioned that while biotech is "risky," as with any oncology drug venture, he opined that Arch was solid, had a very bright future, that they needed someone with expertise to take care of the employees, and that she was going to be happy if she made a decision to join Arch.

37.     On June 28, 2022, Gangemi signed the Offer Letter, while contemporaneously Julie Schroeder had been texting and calling her in an attempt to convince her to resign from Daiichi even before her background check at Arch cleared, which Gangemi thought was a rather strange approach. Gangemi refused; having had a history of advising others never to resign a prior position until one clears a background check with the new employer, she thought it poor advice coming from Schroeder, and she followed her own advice.

38.     On July 6, 2022, Gangemi resigned her position at Daiichi, *effective July 22, 2022*.

**Foreboding News**

39.     On July 8, 2022, *while still a Daiichi employee*, Gangemi received a call from Schroeder who told her that Blumberg wanted to speak with her immediately.  As a result, a "Teams" meeting was scheduled for 4:45 in the afternoon but inexplicably Blumberg, the person who had convened the meeting, never appeared on the call.

40.     Schroeder indicated the reason for the call; that while there had been a clinical event ("Event"), "everything was fine" but Blumberg still wanted to talk with her.

41.     On July 11, 2022, in a conference call with Blumberg in New York and Schroeder in Massachusetts, Blumberg informed Gangemi about the clinical Event in which a 42-year-old female patient with ovarian cancer had died during the trial within the last few days. In fact, upon information and belief, the patient had died a number of days earlier, either on July 5th or 6th.

42.     Blumberg indicated that the decedent had died from a "clot," which he said was very unfortunate.  Blumberg said he thought it was attributed to the drug, but that Arch had the other protocol to address the issue on that Molecule (subcutaneous administration and pre-dose with Eliquis).

43.     Sometime thereafter, on a Board call, Gangemi learned that the woman actually had died from a Sagittal Sinus Clot, a thrombosis way more serious than what one would describe as a "clot".

44.     Had Gangemi been made aware that the death had been attributed to a Sagittal Sinus Clot she would have put the brakes on her employment with Arch as Gangemi later learned from her wife, also a medical doctor and who had overheard the conversation with Blumberg in which he failed to disclose this most important of facts, the significance of a death resulting from a Sagittal Sinus Clot.

45.     Blumberg indicated that Arch had a meeting with the FDA upcoming the next Friday concerning the Event.

46.     Concerned at what she now heard on the Board call, Gangemi pointedly asked if the Company "was in trouble", and whether it still needed her, convinced that that she could rescind her resignation with Daiichi if Arch were in trouble as a result of the Event.

47.     Blumberg's response was that "we need you" and that "everything will be fine," Blumberg added that, things could be a little rocky, but this was *pro forma* and reiterated the support of the Board and the elite group of investors.  Blumberg was "confident" that Gangemi should join Arch because it needed her leadership and there was no real issue here.

48.     At that point in her conversation with Blumberg, he reiterated that they were very "well capitalized and while this (Event) was unfortunate, they had the other compound/molecule, G4 which would have a better safety profile" He reiterated his mantra that Arch had an "elite group of investors" that were 100% behind him and the "team."  Blumberg reiterated that Gangemi was now part of the leadership team and that he needed her.

49.     Gangemi, still concerned about how this Event might affect the Company, texted Schroeder and said that if Arch was going to be in trouble, "I don't want to be a VP of HR for 2 months," something she had earlier said to Blumberg.

50.     Gangemi, who had informed Schroeder that she was interviewing with at least two other companies and could jump on another offer, stressed that she did not want to join a company only to be unemployed in a few months.

51.     Schroder reassured Gangemi that Blumberg was an excellent CEO, and the Company would be "fine," continuing that Blumberg was very confident of Arch's future and had assured Schroeder that Company would be fine even in the face of this Event which Schroeder downplayed as not unusual according to Blumberg.

52.     On July 16, 2022, Gangemi, still a Daiichi employee, received copies of a few emails from the CFO, Anderson, to Blumberg regarding laying off a number of people. These emails gave Gangemi great concern.

53.     On July 22, 2022, on invitation, Gangemi attended an Arch "All Hands" meeting via Teams" at which Blumberg introduced her to all the Arch Employees and indicated that Gangemi's official start date was three days hence on July 25, 2022.

54.     Gangemi had resigned her position, at Daiichi, the US subsidiary of Daiichi Sankyo, Tokyo, on July 5, 2022, as Senior Director, Employee Relations and Employment Practices for over four years, and sat on the HR Leadership team, with an annual salary of $275,000, and an annual bonus target of 27% and Long-Term Incentive Target of $80,000 of RSUs.

55.     During the numerous interviews Blumberg had told Gangemi that he needed a strategic head of Human Resources to support the Company, and its future growth (estimated by Blumberg to be 20-30% with the two molecules under development), of the two oncology Molecules; G2, in human trials for ovarian cancer; G4 for multiple myeloma.

56.     According to Blumberg, the G4 molecule was the "next generation of the G2, different molecule, better clinical safety profile and better efficacy."

57.     Blumberg told Gangemi numerous times during interviews, and in the first days of joining the Company, how Arch planned on developing the G4 Molecule which would drive the future growth of the company.

58.     Gangemi realized later that, Blumberg was reiterating much of what was detailed in an article from Endpoints News, dated April 27, 2021, a "pitch" piece for the industry; that Arch strategically hired a CMO and a CSO, one with liquid tumor experience, the other with solid tumor experience because the Company was exploring multiple pathways for the Molecules.

59.     According to Blumberg, Arch was partnering with Merck Pharmaceuticals (Keytruda) on one of its key trials, conducting a combination study.

60.     Blumberg restated, as he had in the multiple prior interviews, that because Gangemi would sit on both the Executive Leadership and the Leadership Teams, and that the position came with significant equity in the company, she would make a lot of money and specifically that Gangemi would be granted .04% of the value of the Company, which was more than she had Daiichi.

61.     During those conversations, Blumberg talked about the "current valuation" of the Company and that she would "be way ahead" of her current equity holdings.

62.     These statements were made by Blumberg in direct response to Gangemi's reminding him that she was leaving $250,000 worth of RSU's on the table. His response was that her equity stake in Arch would be worth much more.

63.     In fact, Blumberg had no reason to believe in the truth of these statements or made them in reckless disregard of the truth as the Valuation which had been ordered by the Board never occurred due to his failure.

64.     On the following Monday, Gangemi, Blumberg, and Schroeder spoke on a Teams call at which time, in light of the reported Event, Gangemi asked pointedly if Arch was going to weather the storm, and whether Arch still needed her; Blumberg's response was that "I need you, we need you, it might be a little bumpy, but it will be fine.  The board is 100% behind the leadership team and the Company, we are well funded, and we will get through this."

65.     In fact, Blumberg, aware of the reason for the patient's death, and the FDA intervention, had no sound reason to make such a statement, or made the statement in reckless disregard of the truth.

66.     Gangemi reminded Blumberg that she was leaving a very stable job organization that "loved her," that she received the highest percentage of salary increases available that year and had over performed on Bonus and Equity levels.

67.     In turn, Blumberg assured her that Arch was in good position to respond to the FDA, and good position financially; while Blumberg indicated that they might have to cut a "few people," perhaps in clinical operations, the leadership team, of which Gangemi was joining, would be fine.

**Strange Position**

68.     After this call, Gangemi received a few emails to her personal email from the CFO, Kirsten Anderson, with some information attached (spreadsheet of all the employees, details about salary, etc.), which seemed highly unusual as she had not even started her position with the Company.

69.     Originally believing it to be a mistake--that her personal email was copied—she received additional texts and calls from Schroeder.

70.     Shortly after this call and for numerous days before and after, Schroeder would call and text Gangemi regarding joining the company sooner.  Schroeder also sent Gangemi the background check and put a rush on it; it was completed in a few days.

71.     After Schroeder called after the background check had cleared, Gangemi officially resigned from Daiichi Sankyo.

72.     On or about July 28th, Gangemi, literally on the job for but a few days, was asked to put a severance plan ("Plan") together. Schroeder already had put together a schematic of what a potential severance plan might look like for non-contractual employees. [1]

---

[1] All VP's, SVPs and the CEO had severance outlined in their employment contracts; VPs 6 months with COBRA, SVPs 9 months with COBRA, and the CEO 12 months with COBRA.

73.     This Plan specifically was for non-contractual employees, as under the system in place at the time, they would have received no severance.

74.     Gangemi presented the Plan to the Board at a meeting on August 2, 2022, including various emails, pre and post meeting, with Board member Carole Nuechterlein of Roche Venture Capital Fund, as well as Chairman John Mc Kearn.

75.     The Board was dissatisfied with the Plan Schroeder had authored because more severance would be granted to senior level employees, i.e., with little, or lesser amounts, to lower-level employees without regard to tenure with the Company.

76.     Gangemi explained that this schematic was Schroeder's, and though only on her fourth day with the Company, she would propose a "flat Plan" which would be a set number of weeks for all employees and would also be easier to administer.

77.     Nuechterlein responded that the Board would agree to something along those lines and would respond with its own suggestions as well; in fact, Carole Nuechterlein responded with three options from the Board.

78.     Blumberg was unhappy that the Board did not accept Schroeder's Plan, and made it known to Gangemi.

79.     By the August 2, 2022, Board meeting, Blumberg now was recommending not to proceed with the G2 molecule.  Conversely, in an early interview (in NYC) Blumberg had indicated that "Oncologists are used to dealing with side effects and that they are not uncommon with these types of therapy."   Gangemi believed Blumberg that the drug was both safe and effective.

80. However, once Blumberg recommended to shut down the program, it was evident that the layoff would most likely be more than "a few people". In this Board meeting the Board members were saying that their funds *would not be investing further in Arch Oncology despite its financial condition*. The indication clearly was that it was due to, *inter alia*, the Event, but that there clearly were ongoing financial issues.

81. This was the first time Gangemi had any sense that the Company was in financial trouble, and apparently had been, and did not have the "more than one year of operating cash" which Blumberg had represented repeatedly in interviews, in addition to his misrepresentations that the Company's investors solidly were behind him and Arch.

82. At this time, Gangemi began serious inquiry of Kirsten Anderson concerning the Company's cash position while working closely with Anderson on severance scenarios.

83. Carole Nuechterlein sent Gangemi a few emails after rejecting the original Schroeder severance Plan, copying other Board members who sat on the "compensation committee."

84. Nuechterlein apologized to Gangemi via email, saying she was sorry Gangemi "walked into this," and hopefully that she "would get a nice severance." Nuechterlein also apologized to Gangemi during the second Board meeting which Gangemi attended and was asked to stay afterwards to discuss severance options.

85. Nuechterlein, stopped the meeting before it started and said, "I want to recognize this is Paulette's first week with the Company, this is very unfortunate that she joined Arch during this difficult time."

86.     On August 4, 2022, Gangemi sent Blumberg an email asking if she could attend the "Clearview" meetings which were set up with a third-party to analyze the Molecules and the competitive landscape. Blumberg refused her but she came away from that discussion with the impression that he had little confidence in the product.

87.     This was also a great surprise to Gangemi after how Blumberg had touted the promise of both Molecules.

88.     By this time Gangemi was aware that Blumberg had been misrepresenting more than the financial position of Arch; he had been misrepresenting Arch's place in the oncology marketplace. [2]

89.     On August 16, 2022, Gangemi sent Blumberg information and spreadsheets on the entire company, including salaries, in order to facilitate a restructure of the Company to only support the G4 Molecule, which Blumberg inexplicably had been requesting from Gangemi; detailed financial information on severance, information to which only a CFO would have access. This was a strange request as Gangemi kept telling Blumberg that she would need to work with Kirsten on the financials to accommodate any severance issues; he still objected.

90.     But Gangemi had no choice and was compelled to reach out to Kirsten to ask her for the information and models which Blumberg had been requesting.

91.     Kirsten Anderson then set up a meeting, styled "Touch Base on Budget" to discuss the current cash situation; it was disclosed that Arch only had enough cash to continue operations until approximately October 2022.

---

[2] See Endpoints Article, April 27, 2021; Blumberg's comments in this article are eerily similar to what he had said in their interviews, some of it word for word.  Gangemi realized that it was a "pitch" and that much of what he said was untrue.

92.     This was not only surprising information to Gangemi, but it was also astonishing in that in every interview Gangemi had with Blumberg and Schroeder she had been told that the Company had enough cash on hand for at least a year, if not longer, in addition to what Blumberg repeatedly indicated was an unfettered line of credit from those investors whose representatives sat on the Board.

93.     On August 20, 2022, Kirsten Anderson informed Gangemi that she, Anderson, was to have a meeting with Kallander and Associates, a company wind down specialist.  Anderson invited Gangemi to the meeting at which time, Anderson disclosed that Blumberg actually had contacted Kallander in January of 2022 *(incredibly, 5 months prior to engaging Gangemi in interviews)*, and showed Gangemi an email from Blumberg that Garen Bohlin (who had interviewed Gangemi) referred Blumberg to the wind down organization earlier that year.

94.     It was apparent to Gangemi that Blumberg was planning a lay off well prior to her engagement with Arch and that Blumberg had misrepresented the Company's financial health *ab initio*.

95.     At about this same time Blumberg became irate with Kirsten Anderson for instructing scientists and MDs to stop signing new contracts, and to stop spending money which she indicated the Company didn't have.  Anderson was becoming increasingly frustrated because Executive Leadership Team members were scheduling wine tasting events, offsite meetings, booking travel, and signing contracts, obviously unaware that the Company was close to a point where they would default on severance payments in the event of a wind-down.

96.     For example, Anderson told Gangemi to instruct Nakano to release a hotel that was on hold for an upcoming all employee meeting in Denver Colorado; to stop work on the redesign of the Arch website; and other projects Schroeder and Blumberg had spoken about during the interviews and on which Blumberg ostensibly was moving forward.

97.     Blumberg sent a note to Gangemi and Anderson that the Executive Leadership team and broader Leadership team purposely did not know the Company's financial situation, instructing Anderson to stop telling people not to spend money because it would scare them, and they would leave the Company.

98.     Blumberg was becoming increasingly hostile toward Gangemi and Anderson, as he said he did not want people at the Company to know what was going on, because they would leave Arch while he was trying to "make a deal."

99.     Anderson and Gangemi, with a combined experience in pharma of about 40 years, both knew that the due diligence process on a Molecule, or a company, takes in excess of six months and Arch only had cash for about that many weeks; both wondered why Blumberg was not facing this issue that the Company would be gone before any deal could be made, in addition to the Company not having any appreciable cash.

100.    But Blumberg kept insisting that he was "trying to make a deal."

101.    This was very confusing to Gangemi because in Board meetings Blumberg had been so negative about both Molecules, that essentially both were "worthless," saying they were not worth anything, and that the competition was too great, that she wondered what he was going to be selling in any deal?

102.    These statements were the antithesis of what he had been telling Gangemi in interviews. Gangemi texted Blumberg during the August 18, 2022, Board meeting regarding his negativity about the Molecules; he agreed.

103.    After the August 18, 2022, Board meeting, Gangemi called Steve DeMattos to ask why he and Louie Naumovski Chief Medical officer, sounded positive on the G4 while Blumberg so negative.  DeMattos responded that that Blumberg "is down" on the Molecule but did not provide any explanation, other than "biotech is risky",

104.    Gangemi then asked DeMattos, "Why did Arch hire me away from a great company, where I was loved and respected to join a Company that was clearly in financial trouble" with Gangemi observing that that Blumberg had misrepresented the financial situation of the Company and misrepresented the G4 Molecule, asking "What changed in 4 or 6 weeks?" Dematos had no satisfactory response.

105.    On August 18, 2022, at 2:21 Blumberg texted Gangemi; his text asked, "Did you tell Steve you weren't fully aware of Arch's risks?  We need to talk."

106.    Thereafter, a Team's call was set up between Schroder and Blumberg and Gangemi regarding the texts she had sent Blumberg during the Board meeting, and Gangemi's call with DeMattos.  The group finally connected that night and Blumberg screamed at Gangemi that her talking to Dematos was wrong and that he, Blumberg, knew everything that was said; Blumberg called Dematos "his agent" and that "Steve tells me everything."

107.    Blumberg and Gangemi spoke one additional time with Schroeder during this time, with Gangemi telling Blumberg "I know you contacted a wind-down specialist in January, I have email proof of it. Why would you hire me into a Company that was in financial straits?"  Irate, Gangemi also disclosed that in addition to his contacting the wind-down specialist she learned that Blumberg had never filed the 409A Valuation and told him that that he had to know that the equity he had rated, and to which he ascribed tremendous valuation was both untrue and worthless.

108.    Blumberg response was incredible. He said, "You would not have joined if I told you those things, *plus it is none of your business*."  Blumberg went on to state that contacting the wind-down specialist in January was "just good housekeeping," whatever that meant.

109.    Gangemi responded, "Good housekeeping would have been to have a severance Plan approved, especially since you had an HR consultant in Schroeder for $300 an hour for a year and a half."  Blumberg said he "didn't need this" and terminated the phone call stating that he was "sick" and needed to rest.  Blumberg also said, "an HR person should know better than to call someone when they are "sick."  Gangemi asked, "Are you on disability or something?" to which he responded no and terminated the call.

110.    During this time Blumberg sent emails complaining that Anderson too was emailing him and "bothering him" while he was "sick".

111.    Around this time Kirsten Anderson asked Gangemi to reach out to Carole Nuechterlein to set up a conference call during which Anderson detailed the dire financial situation of the Company, the infirmity of the cash position (only cash until about October), monthly bills of $200,000.00 with the Goodwin Proctor Law firm, as well as to various other consultants and friends of Blumberg, including Danforth Advisors, which had large outstanding invoices; these included Bohlin's invoices for serving as Blumberg's "coach."  Anderson voiced concern that Blumberg was trying to "pay his friends" before any of the severances got paid.

112.    Gangemi informed Carole Nuechterlein that Blumberg had threatened to fire her and Anderson for doing the work which the Board explicitly had instructed them to do with respect to a Severance Plan, which was to prepare the Company in the event there was a wind down.

113.    On August 25th Gangemi emailed Carole Nuechterlein informing her that Blumberg demanded that Gangemi meet with the General Counsel, Dan Zavodnick, and Julie Schroeder that day.  Gangemi passed on this information to Carole Nuechterlein, concerned that there was a possibility of being terminated by the end of the meeting.

114.    Carol Nuechterlein responded, "see my other email – I had to get buy in from John (McKearn) and Eric (Pham). Kirsten will send to you." This email was from Carol Nuechterlein terminating Julie Schroder's relationship with Arch and terminating her computer access to Arch Systems.

115.    Anderson notified IT to shut down Schroeder's access, which was terminated by the time Gangemi later had a 5:30 call with her and Dan Zavodnick; Gangemi informed Schroeder during that call that the Board had terminated her access and instructed Anderson to terminate her engagement.  Anderson instructed the IT vendor to assign Schroeder's email box to Gangemi, which was a customary practice at Arch Oncology when a contractor or employee left the company.

116.    When Blumberg became aware that Schroeder's access had been terminated, he began contacting Anderson, Nakano, and the IT vendor Ryan Kanazawa over the next several days.  Kanazawa is the husband of Nakano and operates an IT consulting company that provides IT services to small companies.  Kanazawa reported to Anderson and took direction from her.

117.    At Carole Nuechterlein's direction, Gangemi sent an email that day to the Board members who were copied on the prior email regarding Schroeder's access, instructing Kanazawa not to destroy any documents and to only take direction from a Board member or Anderson regarding Schroeder's access to Arch email and computer systems.

118.    According to Anderson, Blumberg became irate, berated Kanazawa and Nakano for days, and lied about a "midnight board meeting to reinstate Julie Schroeder's access".  Kanazawa never did restore Schroeder's access.

119.    Anderson indicated in a subsequent ELT meeting, that DeMattos asked, "will Julie be supporting us" and Blumberg responded, "No, the Board says she is too expensive."  On organizational charts presented to the Board of Directors it showed that Schroeder exited the company and it also showed that Schroeder reported to Gangemi.

120.     On August 25, 2022, at an Executive Leadership team meeting Anderson discussed the "layoff list" where everyone in the Company had a layoff date, either of 9/1/22, 9/15/22 or 10/1/2022; explaining the extreme problems with the current cash position, liabilities, and severance and that the Company would need to adhere to this schedule in order to not default on the severances. It was evident in this meeting that the ELT members were confused by the list and why everyone had a layoff date.

121.     Louie Naumovski, MD (Chief Medical Officer) and Amit Agarwal, MD, PhD (Chief Scientific Officer) called Gangemi on Teams after that meeting.  They asked, "Who put together that list?" Gangemi informed them that Kirsten Anderson created it because of the cash situation, while Gangemi asked both if Blumberg had informed them about the cash situation at Arch; they both responded they did not know anything about the cash problems at the Company.  Gangemi asked both if it, "did not now make sense that Kirsten had been asking you to not travel, sign contracts, spend money?" Both tried to negotiate exit dates, but Gangemi instructed them to speak with Anderson.

122.     Dan Zavodnick, VP of Legal, called Gangemi on Teams on August 25th or 26th informing her that Blumberg had told him that she was not to speak with anyone at the Company except him, Christina Lewis from the Goodwin Law firm, or Kirsten Anderson.

123.     Zavodnick told Gangemi that he had "fought hard" to get Gangemi to be able to speak with Anderson, because as the HR person Gangemi was instrumental in discussing details of termination and severance.

124.     By that time, she had prepared all the severance training materials for managers, severance agreements, FAQs, and other documents to assist managers and employees during the layoff.

125. Zavodnick told Gangemi that going forward, she would be reporting to him.

126. However, Blumberg later removed Gangemi from the ELT Teams Chat and all future meetings, board meetings, and ELT and LT meetings.

127. August 27, 2022, Kirsten Anderson sent an email to Carol Nuechterlein, John McKearn and Joe Biller titled "Good Faith Complaint" where she detailed the dire cash situation at Arch; that she felt Blumberg had been trying to "pay his friends," and the mounting bills from Blumberg's personal friends firms; she complained of Blumberg's abuse of her and Gangemi, and that she felt Blumberg was not acting within the best interests of the Company.

128. At this point, Gangemi had been constructively discharged by Arch on August 31, 2022, as a result of Blumberg's actions walling her off from any actions as VP of HR, although she received no letter or notice of termination.

129. Blumberg also was terminated from Arch Oncology on August 31, 2022, by the Board; upon information and belief, this was effectuated by the Board as Gangemi still was receiving Arch emails and received a "goodbye" email.

## COUNT ONE

### (Breach of Contract and COBRA Violation)

130. Plaintiff repeats and realleges paragraphs one (1) through One Hundred, Twenty-eight (128), inclusive, as fully set forth at length herein.

131. Pursuant to the Offer Letter, Gangemi is entitled to six (6) months of severance payments if terminated without cause.

132.    Not only was Gangemi terminated without cause, but she was constructively terminated by Blumberg prior to his dismissal from the Company by the Arch Board of Directors on or about August 31, 2022.

133.    Despite due demand by Plaintiff's counsel, Arch has failed to make any Severance payments, or to pay for Gangemi's medical premiums for the same period or, alternatively, to advance her the premiums for the payments required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") as provided in the Offer Letter. This failure is a violation of Gangemi's federally guaranteed rights.

134.    As such, Gangemi is entitled to approximately $137,500.00 in Severance payments, together with $1,000 per month to cover COBRA premiums per the Offer Letter.

135.    By reason therefor, Gangemi is entitled to recovery over and against Arch in those amounts, together with such other and further relief as to this Court appears just and proper under the premises.

## COUNT TWO

**(Promissory Estoppel, Fraud in the Inducement and Misrepresentation
by Defendant Blumberg, by Arch and, collectively by the Board
of Directors of Arch Oncology, Inc.)**

136.    Plaintiff repeats and realleges paragraphs one (1) through One Hundred, Thirty-Four (134), inclusive, as fully set forth at length herein.

137.    During the interview process, which started in April of 2022, Gangemi made it known to Arch, through Blumberg, and to Blumberg directly, as well as to Julie Schroeder, an independent contractor who served as advisor to, and was interfacing with Gangemi on behalf of Blumberg, that Gangemi was not interested in leaving her employ at Daiichi to go with a Company which was undercapitalized.

138.    In interviews and conversations, *inter alia*, Blumberg represented that the Company had "plenty of money," more than a year to be exact, was financially sound, and had firm commitments that the Company was, and would continually be financially supported by its elite investors whose representatives sat on the Board.

139.    Blumberg represented that he had made Gangemi's concerns known to the Board in discussions with the Board, *qua* Board, as well as with individual Board members, such as Joe Biller, when discussing the prospective hire of Gangemi. Consequently, the Board, to which Blumberg reported, was aware of Gangemi's discussions with Blumberg and her concerns.

140.    These statements and promises made by Blumberg either were materially untrue, and known by Blumberg to be untrue, or made by Blumberg with no idea of whether they were true, or with a reckless disregard for the truth.

141.    These misrepresentations and promises were reasonably expected to induce Gangemi to leave her secure job at Daiichi and accept a position with Arch, which she did based thereupon.

142.    In addition, Blumberg and, therefore, the Company, as well as the Board in ratifying Blumberg's promises, and offering Gangemi stock options based on a Valuation which Blumberg knew, because he had been so informed in writing, that he could not rely past April. 2022, and was no longer accurate as to the value of any Company equity.

143.    Blumberg, and the Board, and, therefore, Arch was aware that Gangemi was relying on these promises by Blumberg as to the award of stock options, and their value, in making any decision to leave Daiichi for another employment situation.

144.    These statements and promises were false, and were made with the intent to reasonably expect reliance thereupon, as well as to induce reliance in Gangemi to resign from Daiichi and accept a position at Arch.

145.    Had Gangemi been told the truth, she would not have resigned a job where she was earning approximately $335,000.00 per annum.

146.    In addition, at the time of the Event referenced herein above, Gangemi still was a Daiichi employee and, had she been told the truth concerning the death of the patient in the clinical study, she never would have accepted the position with Arch.

147.    Blumberg, and the Board, aware that Gangemi was about to begin her employment with the Company, intentionally withheld a material fact about the cause of death of the patient in the Event, the disclosure of which would have caused Gangemi to decline the Offer.

148.    By reason of the foregoing, Gangemi left Daiichi and thereby lost at least $335,000.00 for which Arch should be held liable.

149.    It would be an injustice to not enforce the promises made by Blumberg and Arch, and ratified by the Board, and a further injustice not to hold the Defendants responsible for failing to disclose material facts about the Event, the disclosure of which would have caused Gangemi to decline the position.

150.    By reason of the foregoing, Gangemi is entitled to at least $335,000.00 in damages in addition to her contractually guaranteed Severance, together with such other and further relief which appears just and proper under the premises, including reasonable attorney fees, and the costs and expenses of this action.

**WHEREFORE**, Plaintiff Paulette Gangemi prays for relief as follows:

a)   On the First Cause of Action in the amount of $137,500, together with the costs

attendant to the advance of COBRA payments required to be made; and

b)   On the Second Cause of Action in the amount of at least $335,000.00,

c)   Together with such other and further relief as to this Court seems just and proper.

Dated: September 16, 2022

*Louis J. Maione*

Law Offices of Louis J. Maione (8589)
303 East 57th Street, 30th Floor
New York, New York 10022
Telephone: (917) 549-5693
Email:  louisjmaione3@gmail.com
Attorney for Plaintiff